This is case number 4100759, Watkins v. Watkins, for the appellant Michael Goldberg, for the appellee Nicole, is it Nelson? Yes, sir. Okay, you may proceed. May it please the court, counsel. My name is Michael Goldberg and I represent the respondent. Keep your voice up, please. It's our argument today that the trial court's decision granting grandparent visitation to the petitioners is an unconstitutional application of the grandparent visitation law. The law that was struck down by Wickham v. Byrne enabled grandparents to get visitation on a best interest standard. It actually had a provision that had a presumption in favor of visitation. That law was struck down in 2002, Illinois Supreme Court, by Wickham v. Byrne. And the statute was changed to one where the grandparent has to show harm to the child for the denial of visitation. And there's also a presumption in favor of the parent's decision. So, in favor of the grandparent or parents? The statute reads that there's a presumption that a fit parent is making a decision that is not harmful to the child's emotional, mental, or physical well-being. So, the one difference in this new statute is that the scales are tipped in favor of the parent from the beginning. There is a presumption in favor of the parent. The second component of the statute is that in order to overcome that presumption, the grandparent has to demonstrate that there is emotional, mental, or physical harm occurring to the child because of that denial of visitation. The trial court didn't find that? The trial court made a finding that there was a presumption and that presumption was overcome. But the order or the ruling from the court couches the harm in terms of not being able to know the father and not being able to develop a relationship or have a relationship with the grandparents. Was he just being kind to the respondent instead of being completely forthright? Well, Justice, I believe that it was an emotional case and I think that the parent, my client, did not portray as a person that you'd want to do something nice for. She's not a very favorable person. But I think that in separating the facts, there were certainly terrible facts that led to this case. But taking the facts out and not favoring one person or the other because of what led to this case, what you have to look at is the relationship between the child and the grandparents. And the Illinois Supreme Court case of Flynn v. Henkel says clearly, neither denial of an opportunity for grandparent visitation nor a child never knowing a grandparent who loved him and who did not undermine the child's relationship with his mother is harm that will rebut the presumption stated in Section 607A.5.3. To answer your question, I believe that when the judge made his ruling, he was using the exact language that Flynn said wasn't correct. The judge didn't talk about, nor were there facts in this case about an emotional bond that would develop between this child because… There certainly was a lot of testimony in the record, as far as I'm concerned, about the failure of the mother to do anything for the welfare of the child. Judge, there was only testimony that the mother was providing for the child. There was no issue about the mother being unfit. There was no issue about her not being able to care for this child. The issue, which the judge took issue with, was that she was not giving the grandparents visitation, not enabling that relationship to develop. And the judge suspected that the mother was not going to maintain or nurture the child's memory of the father. That's where the judge was focused. The record doesn't show any involvement by the State's Attorney of Cass County or the Department of Children and Family Services? It does not, Judge. Should there be? No. The Wickham case, I think this language in overturning the old statute is instructive. In most cases, the relationship between a child and his or her grandparents is a nurturing, loving relationship that provides a vital connection to the family's history and roots. However, as with all human relationships, conflicts may arise between a child's parents and grandparents. In many cases, this conflict will concern disagreements about how a parent is raising his or her children. Yet this human conflict has no place in the courtroom. This is true even where the intrusion is made in good conscience, such as the request for visitation to preserve the child's only connection to a deceased parent's family. Parents have the constitutionally protected latitude to raise their children as they decide, even if these decisions are perceived by some to be for arbitrary or wrong reasons. That's the language of the Illinois Supreme Court, and I would argue that the judge is essentially saying you're not doing this for a good reason, it's mean and it's wrong. He might even say that it was arbitrary, but that doesn't rise to the level of when a court is to interfere with the fundamental right of a parent to raise their child as they see fit. Did the respondent contest the facts that were set forth in the petitioner's motion? In the petition for visitation? Yes. We denied certain components, but I mean, I would assert, Your Honor, that even taking the facts exactly as the grandparents either pled or as they laid out at trial, is still, is not, did not demonstrate the type of relationship that this statute is meant to help or to preserve. There was no, the grandparents had no time where they spent alone with this child. Almost no time. There's testimony about if the dad went to the bathroom on his visit, maybe they had time alone. They are presumably loving parents, they love their granddaughter, but there's testimony from, on cross-examination from our expert, that the child didn't even recognize the picture of her father or even of the grandparents. Has the respondent helped to nurture that relationship? No, Judge. Is there a reason why not? Well, Judge, I don't know. But, and we, everyone in this room might say that that's the wrong decision. Everyone in this courtroom might be different, but the fact of the matter is unless... Well, you say you don't know, but does the record reflect any answer to that? No, I don't believe the record reflects that, Your Honor. The, without evidence, direct evidence of harm to this child, the statute is wrongfully applied. The harm that is mentioned in the record is speculative. The, there's a case that they bring up in their brief, a Michigan case, you know, because there aren't a lot of cases in Illinois, and they bring up this Michigan case. But the Michigan case talks about a substantial risk of harm. And in many places in the record, they talk about things being potentially harmful. This is in our case, a high likelihood of harm, likely to suffer. But the statute talks, it doesn't mention likely. It doesn't say speculative or it might lead to harm. It talks about, it says are harmful or not harmful. It, so what it describes is a situation where, for instance, where the grandparent lives with the child, or the relationship that is there when a parent is deceased or in jail, or one of the parents is not involved, and the other parent almost takes a quasi-parental relationship. This set of facts clearly would have gotten visitation under the old statute, under the best interest standard. But under this new standard, and even though the Illinois Supreme Court hasn't said much about this statute, they have said in Flynn v. Henkel that this type of speculative or never getting to know one side is not the type of harm that is supposed to be protected. But counsel, in all of these visitation cases, whether it's the grandparents or someone else, a psychiatrist or psychologist comes in and testifies. Here, Dr. Trigger and is it Dr. Osgood? Yes. Were called to testify. The judge selected one bit of expert testimony, which was like it always is in these cases. I realize this isn't a normal case, but this is psychological testimony about the harm expected to be suffered. It's the same kind of evidence that's always presented. And this statute doesn't say anything about different types of evidence needs to be presented. No, no, but Flynn v. Henkel, the Illinois Supreme Court says that it's not supposed to be never knowing a grandparent. And the problem is that the court relied improperly on Dr. Trigger's testimony. His testimony, it's on page 32 of the petitioner's brief. The absence of a relationship between Sidney and her grandparents or other members of Stephen's family is a risk for two reasons primarily. One, that I'm not sure she'll get an accurate picture of who her father was from Jennifer's family. I think there is certainly a chance that things will be said that are unkind or may be incorrect about Stephen's character or conduct. It can have an adverse effect on her and even worse, were she to learn the truth of what happened and discover what she was told was not accurate. This is a major basis cited by the petitioner. This is what their expert says. This is relied upon by the judge. But you can take that language and put it into Flynn v. Henkel and it would match up. There wasn't an expert in Flynn v. Henkel. But that doesn't talk about the relationship or any bond that formed between the grandparents and the child. It talks about what's going to happen maybe in the future. It talks about exactly the type of decision that Wickham v. Burns said might be arbitrary or wrong. But the standard is, did the petitioners rebut the presumption and did they demonstrate harm? What did Dr. Trager say? Dr. Trager talked about that it would be bad for an absence of a relationship between Sidney and her grandparents. So if there were no relationship, it would be... The absence of a relationship between Sidney and her grandparents or other members of Stephen's family is a risk for two reasons primarily. If you read on page 32 and 33 of their brief, it's talking about what can happen and may happen. It doesn't describe that they cared for this child for days on end or they were the primary person to watch this child. The whole reason... The parents have this fundamental right. It's been recognized for hundreds of years. Wickham v. Burns says, yeah, you can... It doesn't say there can never be grandparent visitation. It talks about the state can always step in for the health, safety and welfare of the child. And then it gives examples in Wickham v. Burns about if you don't immunize your child or if you have your child not going to school or in the workforce. Those are the type of examples that the Illinois Supreme Court gave us in overturning the old statute. What would they do if they saw the facts in this case? Well, my submission that this case... They would not allow visitation. What would they do to... It's not a criminal case. We're not here in a criminal case. We're here because of the child and we're here because of the statute. Bad facts can sometimes make the right law. I'm not saying these facts are good. I'm not endorsing or condoning what happened. But all I'm doing is applying the facts to the law. I think that if this were the Jones v. Smith case with these facts, I don't think the judge would have granted visitation and I don't think the Supreme Court would either. But Dr. Trager did not say what they said in the Flynn case. He didn't say it was the loss of relationship with the grandparent. The trial court actually referred to the loss of the relationship and the knowledge of her deceased father. The judge quotes Dr. Trager. Sidney has a need... This is the judge's decision. Sidney has a need to know her paternal grandparents and needs to understand them and needs to understand her father. That's language very similar to Flynn. Well, there is a different circumstance here. He also goes on to say, I think knowing her father through her grandparents on what I have heard is going to help her and that's what I'm going to order. But knowing your father through your grandparents, it feels strange to argue against it. I'm not arguing against it. It's wonderful. But it's not what the Supreme Court had in mind. You're talking about the fundamental right of the parent. This is not a parent that we want to like or that we want to help. This is a bad set of facts. But that doesn't change the fact of the relationship between the grandparents and the child and the very tough standard of this law. The fundamental right is going to be interfered with in these type of facts. And it isn't Smith v. Jones next time. The statute essentially goes back to the best interest. But you seem to argue this court should not even consider the uniqueness of the facts in this case. Is that your argument? I don't think that would be possible for you not to consider it. But what I'm saying is that that doesn't change the critical fact of this case, which is between the child and the grandparents. This is a human being who has, you know, I don't want to be insensitive, but doesn't have much of a relationship with these people. Why not? Why doesn't she have a relationship with them? She doesn't have a relationship. I don't know. You just have to read the record. The cause by the respondent. I would submit that there was a very nasty divorce and that my client did not help that. There was a six month period where there was no visitation during the divorce. There was a year that transpired between the father passing away and there being visitation. I would submit to you that there are people who live with grandchildren and who are co-parents who would have acted sooner. I know that sounds indelicate to say, but I don't know why there was a six month gap. Even involving the father during the divorce, I don't know. Certainly, if the child lived with the grandparents during the divorce, stayed overnight, or there was all this visitation, I would have a different argument. I don't think you can ignore the circumstance, nor do I think that this whole law can be stood on its head because of the circumstance. If there's going to be a punishment or something that's going to happen, someone was convicted. If there's going to be something criminally, which I don't know that there is, I think that's pretty much done, it's going to happen criminally. Counsel, I had a question. Page 25 of your brief. Yes. About in the middle of the page there, you say, A comment to the UCCJDA of 1997 provides that this Act bases jurisdiction on the parent and child or person acting as a parent and child relationship without regard to grandparents or other potential seekers of custody or visitation. What precisely are you getting at by having that placed in your brief? Do you see the sentence? I do. I do, Your Honor. Other than just citing the actual language, I don't know. Are you suggesting that the language without regard to grandparents has any impact on this case? I wasn't clear what your point you were trying to make by citing that comment. Well, yes. That is what we're saying. We're saying that she lived in Florida, first of all, and that I think what the UCCJDA is saying is that when there is a parent that can claim custody or has custody, then that's why there's this without regard to grandparents or other potential seekers of custody. You actually have until the red light comes on. Okay, you'll have rebuttal. Ms. Nelson. Okay, please report. There are a few things that counsel brought up that I wanted to address. Can you keep your voice up, too, please? Sure. There are a few things that counsel mentioned that I wanted to bring up right up front. First of all, counsel mentions that there is nothing in the statute that mentions that there's any likelihood that Dr. Trieger testified that there's a very high likelihood that Sidney Watkins could be harmed. However, if we look at the statute, there are 11 factors that the statute requests trial courts to consider when determining if visitation is proper. If you look at Factor 10, which is labeled J, it reads as follows. Any other fact that establishes that the loss of the relationship between the petitioner and the child is likely to harm the child's mental, physical, or emotional health. Therefore, obviously, we disagree with Mr. Goldberg's assertion that there has to be actual harm. In his briefing, he mentioned that we did not meet the standard of actual harm, that that's the standard that the statute requires. And that simply isn't so. The statute, there's nowhere you can find the word actual harm in the statute. That isn't what the statute requires. And we get further clarification of what the statute intends if we look at subsection J. Also, I would like to clarify a few other things before I go back to the mention about harm. Counsel mentioned that there was a six-month gap of time in which the petitioners had no visitation with their granddaughter. That is not true. The record will show that there was three months of visitation, a three-month gap period in which there was no visitation between the petitioners and Sidney Watkins. Not only that, but his assertion that he does not know why is also untrue. At the trial, there was a record introduced into evidence. It was of a proceeding that was conducted on September 17th of 2008, I believe. This proceeding was between the respondent and the deceased, Stephen Watkins. This was an ongoing custody divorce issue that they were having. And in that record, Stephen Watkins acknowledged that he had filed a petition for visitation with his daughter because upon Ms. Watkins receiving the petition for dissolution papers, she abruptly terminated the visitation between Stephen Watkins and his daughter. Of course, in turn, because the Watkins, as they testified at trial, when Stephen saw Sidney, their visitation with her as well was terminated. So that is the reason that visitation was abruptly terminated for three months, not six months. And it wasn't at the fault of the petitioners. Going back to the harm issue, I know that counsel references Flynn v. Henkel quite a bit in his argument. This isn't a case of indirect harm. That isn't what Dale and Penny Watkins testified to, and that isn't what Dr. Trieger testified to. Mr. Goldberg used one of the quotes that Dr. Trieger testified to at trial, which was, absence of a relationship with the petitioners is a risk for Sidney Watkins. However, he went into further detail. He talked about the grief issues that she is going to face that are inevitable because not only of the absence of her father, but the circumstances of his death and her mother's involvement in such, or her mother's family involvement in such. Dr. Trieger testified, children who have to work through the realization of the loss of a parent can have a grief reaction or in some cases become depressed and feel somehow personally responsible for this absenteeism. He further went on to say, to deny Sidney an explanation until she is 10, 11, or 12 is precarious. He finally ended his testimony in saying not dealing with the grief issues can have a long-term effect upon the child. Thus, we severely disagree with the contention that this can be characterized or categorized as an indirect harm in Flynn v. Henkel. Dr. Trieger never testified that the Watkins were simply asserting, I mean, Sidney never knowing us is sufficient of harm to establish in this case, so please grant us visitation. That isn't what he testified to, and that's not what Dale and Penny Watkins testified to. I know that in counsel's reply brief there was much that was made mention of that Penny Watkins and Dale Watkins have contradicted themselves in the record. That they've said, no, it's because there's harm being done to Sidney Watkins. That's why we want visitation. But we want to teach her about Sidney, about Stephen, excuse me, and that is the reason why we want visitation. The two are not mutually exclusive. They can want to teach their granddaughter about their deceased son, about her deceased father, but at the same time want to mitigate the harm that is almost inevitable if the grief issues aren't openly and candidly addressed with Sidney Watkins. We have no testimony on the record from Jennifer Watkins. She refused to testify at trial. She refused to testify at multiple depositions. She had multiple opportunities to testify. Then, no, Dr. Treger is wrong. I am willing to address these issues. No, I can be unbiased. No, I can openly and candidly address these issues with my daughter. She had every opportunity to do so, and she did not. What we do have testimony is from Dale and Penny Watkins saying they're willing to do so, that they have guardianship of their late son's daughter, eldest daughter, Alexandria Watkins, and that she often has questions about her father, and when she feels sad and wants to ask about him, she can and does with her grandparents. Alex testified, sometimes I ask my grandma to tell me funny stories about me and my dad. And how was my grandma's visits with my dad? Anything like that. Obviously, this isn't a case of indirect harm, and this isn't a case where visitation, granted in this case, would frustrate the intent of the statute. The statute does not require that Dale and Penny Watkins have been caretakers, full-time caretakers, of Sidney Watkins. If we look at Troxel E. Granville, Whitman v. Byrne, and Flynn v. Hickle, none of those grandparents were full-time caretakers of those grandchildren, and none of those cases turned on the fact that they weren't caretakers of their grandchildren. We have testimony from Dale and Penny Watkins, Ashley Clement, their daughter, and Alexandria Trox, all testified to the types of activities they did with Sidney and the frequency with which they saw her. Penny testified, Sidney recognized me as Grandma Penny. She'd come to you and we'd talk about hugs and kisses. Ashley, her aunt, said, it got to the point where, you know, before she'd leave, we'd say, oh, can we give you a kiss? And she'd kind of lean her cheek over and she'd let you kiss her. This isn't a case of they had no relationship with her, that this girl didn't know these people, as the counsel states. That's not true at all. And to diminish the type of relationship that they had with her, it's misplaced and it's not true. And the record doesn't support that. And moreover, Counsel, Mr. Goldberg argues that the language used by the trial court indicates the trial court used the wrong standard. What's your response to that? Well, the language I'm talking about, SW has a need to know petitioners, and needs to understand them, needs to understand her father. I'm convinced from what I've heard through this whole process that that's not going to happen. Rather than, I think Mr. Goldberg would argue, addressing the harm, the likely harm, as the statute indicates. Doesn't that language in the trial court seem to indicate that the wrong standard was applied? No, Your Honor. Why not? And I say that because if we look at the very beginning, before the court issues its ruling, the court states the court's exact interpretation and understanding of the statute. And it's exactly as the statute reads. Before the court gave its ruling, the court talked about how the burden was upon the petitioners. And the petitioners had to prove that some type of harm was being done to Sidney Watkins absent visitation with him. So I believe that, honestly, the court is well within its discretion to render its ruling in any form as long as the court submits its understanding. Mr. Goldberg, perhaps, would argue, well, the court cited the statute correctly. But my question is, did the court apply the statute correctly? And doesn't that language seem to suggest that the wrong standard was applied? Your Honor, I can see how there is argument that it seems that the court did not apply it correctly. However, I do think with the collection of testimony that was provided at trial, I would say if there was no testimony at trial similar to that of Dr. Triggers or even Dr. Osbitz, for that matter, then yes, there would be great concern that the trial court did apply the wrong standard. However, there was ample testimony that went beyond indirect harm, that went beyond what was testified to in Flynn v. Henkel. So, no, I do not think that the trial court applied it incorrectly. And so, in keeping with my former points, there was a bond there. I know that counsel referenced, as I said before, that the minor child did not know these people, that there is no evidence that there was any type of relationship, but that's simply untrue. And as I was beginning to previously state, there was absolutely no testimony from Jennifer Watkins. She had ample opportunity to get up there and testify and say, these people are wrong. They had no relationship with my child, but she didn't do that. And the trial court appropriately construed negative inferences. As we cited in our brief, when you're in a civil proceeding and there is evidence set forth and a defendant, excuse me, a respondent, refuses to rebut that evidence, negative inferences can be drawn and they were appropriately drawn in this case. She refused to testify, therefore, and there were credibility determinations made as well. And thus, Dale and Penny Watkins' testimony was appropriately considered by the trial court in that they did have a proper relationship with Sidney Watkins and they did have a relationship with her that was within the intent of the statute. I guess I would also like to go back a little bit, back to the harm part, because the respondent also had her own expert, Dr. Osgood, and Dr. Osgood testified that Sidney doesn't even know her father. In fact, counsel referenced that in his own argument. Sidney was shown a picture of her father, she doesn't know him. Jennifer was asked, do you talk about Stephen, her late father, to Sidney? Jennifer said no. Therefore, we have all the evidence in the world that says this little girl will be harmed, not just if she doesn't know Stephen Watkins, but if she's not, how can you possibly grieve someone and feel like you can openly address and ask questions about them if you feel like he's not even talked about? It's pretended as if he never existed, as if she never had a father, and that is the point that Dr. Treger made, and that is the point, I believe, that the trial court was attempting to make, that it's more than Sidney not knowing her father, it's not knowing him so that she can grieve him properly, so that she can address these issues in the absence of her father, and that is something that the respondent has been unwilling to address and did not testify that she was willing to address. And just briefly, I know that the respondent mentioned some issues in their brief about jurisdiction. There is no evidence whatsoever in the record that Jennifer and Sidney Watkins have lived and resided in any state aside from Illinois. In fact, we had a deposition that was specifically limited to jurisdictional issues in which the respondent was asked to testify to jurisdictional issues, to testify to her residency in Florida, the fact she relied upon the claim she was a resident of Florida, and the fact that she relied upon to say that Illinois did not have jurisdiction and that she had no significant connections with the state. She refused to answer any of those questions. Did Dale Watkins testify that she was a resident of Florida? No, Your Honor. Dale Watkins testified that she had been living in Florida with her brother, Josh. However, there was no time period attached to that. When you talk about the UCCJA and you look at the section, it talks about a home state. In order to strip Illinois of jurisdiction, Jennifer Watkins has to be able to establish that six months prior to the commencement of this filing of this petition that her and Sidney Watkins were living in Florida, that they were residents of Florida. Dale Watkins, there was no testimony that he said, well, a month ago or two months before this was filed or in December she was living with her brother, Josh. It was upon his information and belief that at some time, yeah, Jennifer had been in Florida with her brother, Josh. However, there was no time period attached to that. No establishment of the six-month residency requirement within the context of the statute. So, I guess those are the issues that I wanted to address as far as the jurisdictional issues. I'm sure counsel will address those, as well as the harm. Quite frankly, the only way that this statute could have been unconstitutionally applied to the respondent is if Dale and Penny Watkins didn't establish any of these relevant factors that Section 5-607 requests trial courts to consider in determining visitation. Yet, we have an abundance of testimony that I cited from Dr. Trieger, talking about the grief issues, talking about the likelihood of harm, of depression episodes, and that harkens right back to subsection J, which talks about any fact that establishes the loss of a relationship is likely to cause harm. We have the length and the quality of the relationship, which Dale and Penny Watkins testified to, that they saw Sidney approximately once or twice a week, absent three-month period in which visitation was terminated. And then we have testimony from Dr. Trieger and Dr. Osgood, who both testified that they were absolutely sincere in their desire to seek and maintain a relationship with Sidney and to seek visitation with her. These are all the factors that the statute asked the trial court to consider, and these are all the factors that were brought up in trial and that they were established at trial. Let me ask you about Section J. Sure. Was Section J in the statute before grandparent visitation was added? You know, Your Honor, I don't know the question and answer to that. I'm assuming it was, since it reads under the grandparent visitation provision, so I can't help but assume that it was. It was that all those 11 factors were created in contemplation of the grandparent visitation provision. Counsel assumed hypothetically this court believes some visitation would be appropriate. Mr. Goldberg argues in his brief the minor child had never been alone with grandfather. The minor child was only alone for minutes with grandmother. The minor child has never spent more than six hours at a time with the paternal grandparents. The minor child has never spent an overnight with the paternal grandparents. Given, and I think that is factual. If not, I'm sure you'll explain why it isn't. Given that, how could it be reasonable for the court to have decided to give two weeks of consecutive visitation with the grandparents and away from the child's mother? At trial, Dr. Trieger testified he was asked, if visitation is granted, how should the court go about ordering that? Dr. Trieger testified that it should be slowly in increments and slow times for maybe one or two hours at a time. Supervision isn't required because Dale and Penny Watkins are raising their own granddaughter. They don't seem to be irresponsible people. They are completely capable of unsupervised visitation with Penny Watkins. After time has evolved, maybe five to six hours of visitation progressing to overnight visitation. If you look at the court's order, the court went exactly in alignment with the expert testimony  The first three visitations were from 1 to 3 p.m. on a Saturday and all three of those were supervised. So even though Dr. Trieger said, no, I don't think there's any need for them to be supervised, those visits were actually supervised. After that, after the first three visitations that were a couple of hours, then the trial court moved to five to six hours. I believe the visitation was maybe 1 to 7 p.m. on a Saturday and that was for three to four weekends. Then after that, it gradually moved to overnight visitation. So I think that the trial court was very reasonable in its order of visitation because it showed that the trial court actually followed the expert testimony right along and actually went overboard and over-accommodated Jennifer Watkins and Sidney Watkins and in ordering this visitation was very sensitive to the fact that although Sidney did have a relationship with Dale and Penny Watkins, it had been a while since she had seen them. So I think that the visitation order, it illustrated that because it was very sensitively crafted. Does that answer your Honor's question? It does answer my question. It concerns me a little bit for two weeks consecutive for this minor who is just shy of four, correct? Correct, Your Honor. To be away from her mother. You know, what I will represent to the court is, one, that two weeks of visitation is in the summertime and that's presuming that obviously it's not a basis of our motion to dismiss, but it's presuming that over time, I mean this visitation order was rendered in September of 2010 so you're talking about almost every other weekend of her seeing Dale and Penny Watkins and then finally almost a year later there comes to be the two weeks in the summertime. So we're assuming by this time she's seen Dale and Penny Watkins once or twice, maybe even three times a month. So by the time summer comes along, she's perfectly comfortable with them and she's perfectly willing to spend two weeks with her grandparents. It's not going to feel unusual or out of the ordinary because it's a progressive visitation order. And in any event, the visitation order could be amended. Correct. With that, I believe, Your Honors, that we have established all of our appropriate points and request that this court affirm the decision of the lower court and deny the respondent's appeal. Thank you. Thank you, Counsel. Mr. Goldberg on rebuttal, please. Thank you. Your Honor, I think your comment about the scope of the visitation is important. If you look at the visitation that the father had in the divorce before he was killed, it was Saturday during the day. I don't remember the hours. It was Sunday during the day. It was not overnight. And that was with the child's father. I think there was a lot of talk about reintegration and I believe that was essentially ignored by the court because I do believe to their credit, Dale and Penny acknowledged on cross-examination that they would be willing to see to have a health care provider or therapist be involved in the first few visits. The judge didn't even require that. There was no the mom wasn't present for any of the visits and so I think that the fact that we even have to talk about how traumatic it might be for the child to be overnight emphasizes the point that perhaps the statute is being incorrectly applied and it's not to the total extent of being reversed, at least to set up a visitation that would be more in keeping with the child's age and the amount of time that the child had spent with the grandparents before the case was filed, taking into account a year lapse of before it was filed and then it took almost eight months for the case to go to trial. That's a long time. I would I do happen to know that Jay is part of the new statute. It wasn't a carryover from the old statute so it is part of this new law. Part of the amendment that went through in 2007? It is. My comment to that would be that it's essentially the type of clause that is in many type of laws where it talks about the type of evidence that a judge would be allowed to consider if you look at Section 3 further up, it talks about in making a determination under the subsection, there's the rebuttable presumption that a parent's actions and decisions regarding grandparent, great-grandparent, or sibling visitation are not harmful to the child's mental, physical, or emotional health. The burden is on the party filing the petition under this section to prove that the parent's actions and decisions regarding visitation times are harmful to the child's mental, physical, or emotional health. That's the standard. I can see why she brought that up and that's a good argument, but I believe that Jay, as I said, is that type of statute when there's a long list and at the very end it says you can also consider anything else that would be appropriate and I think that's why the word likely is there. I don't think that that changes the standard of this statute. Was your argument, wasn't it, that the trial court used the wrong standards given the language that the trial court used in its order? Well, and as you said, the trial court used the right words, it just didn't follow the standard. I mean, it talked about a rebuttable presumption and it talked about it being overcome, so it used the right language, the court used the right language, but there was no facts on which it could be based at all. Even the doctor, the expert witness' testimony, those facts weren't sufficient? No, Dr. Trager's testimony is all talking about what would happen in the future, how the mother isn't going to talk about the father, isn't going to talk about the death, what happens if the child finds out about how the father died, and talks about how it has to be the grandparents that does that. Well, couldn't I say, and that is likely to harm the child, couldn't you conclude based upon those findings the likely harm aspect of it? You could say that. So under Jay, you could consider it. But under Wickham, under Flynn v. Heckel, you can't, there has to be something else. Did they live for six consecutive months, were they a daycare provider, or any type of evidence, but so clearly it could be considered and I wouldn't, I mean, I'm just agreeing with you, sure, that could be considered, but you can't make the whole case on it. You can't, the whole case is based on that. The grandparent visitation cases are the ones that are less extreme than this. They're all based on cases where the mom maybe for no good reason is not giving visitations. Grandparents are almost always wonderful people. I represent grandparents in my cases. It's the kind of thing where on the street you might say, this is wrong, this isn't what's supposed to happen, but the grandparents might interfere with the fundamental right based on that. For the record, is the respondent present in court here today? No. Counsel, we're going to take the motion to dismiss with the case. We got your response just today. Your client is not living in Illinois, is still in Florida? I don't know. I suspect she's in Florida. I can't make the representation. Clearly there's been no visits, but I thank you, counsel, and thank you. The case is submitted. The court will stand in recess until further call. Is it? Thanks, man. You're going to shut the... Alright. You're going to shut the recording? Okay. Cool. Thanks, man.